**Mario GOICO, Plaintiff,**

v.

**The BOEING COMPANY, Defendant.**

**No. 02–1420–WEB.**

United States District Court,
D. Kansas.

July 15, 2004.

Jeff C. Spahn, Jr., Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, for Plaintiff.

Forrest T. Rhodes, Jr., Mikel L. Stout, Foulston Siefkin LLP, Wichita, KS, for Defendant.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff Mario Goico claims that his employer, the Boeing Company, unlawfully

discriminated him based on age, national origin, and veteran status. He also alleges that Boeing retaliated after he complained of the discrimination. The matter is now before the court on Boeing's Motion for Summary Judgment. The court finds that oral argument would not assist in deciding the issues presented.

According to the complaint, plaintiff was employed as an engineer at Boeing for over 25 years. He also served in the Kansas Air National Guard and Air Force Reserves as a pilot flying the KC-135 aircraft. In 1998, part of plaintiff's duties at Boeing included flight testing the KC-135R. Plaintiff subsequently sought to become a full-time test pilot with Boeing but was passed over for such a position on two or more occasions. Boeing's refusal to hire plaintiff for these positions forms the primary basis of his complaint.

## I. *Facts.*

1. Plaintiff is a 58-year old salaried engineer of Cuban heritage who has been employed by Boeing as an engineer in Wichita, Kansas, for a total of 26 years, and continuously since March 4, 1980. He was born in Cuba and immigrated to the United States when he was 16. He lived in an orphanage in Wichita until graduating from high school, and then put himself through college. He graduated with a B.S. degree in Aeronautical Engineering from Wichita State in 1973 and a Masters degree in business administration in 1985. He joined the Kansas Air National Guard and the Air Force Reserves as a pilot. He served with honor and distinction in a number of engagements, including the first Gulf War, and eventually rose to the rank of Colonel in the Air Force Reserves. He retired from the Air Force on February 1, 2002, as a Colonel.

2. Plaintiff served as a KC-135 pilot in the U.S. Air Force Reserves. He was never certified as an Instructor Pilot, or "IP." He was one of the few Colonels in the Air Force who flew as an aircraft commander. From 1995 to 1999, he served as Lt. Colonel of the Air Refueling Squadron at McConnell Air Force Base in Wichita, and was in charge of deciding who should be selected as Instructor Pilots. Plaintiff could have obtained his IP rating from either Altus Air Force Base in Oklahoma or the Boeing Flying Club. It would have required about two weeks of training and passing a check ride. Nobody from Boeing suggested that Plaintiff obtain his IP rating or that it would be a factor in any hiring decision.

The Boeing job requisition for the two test-pilot positions at issue in this case does not indicate that Boeing desired the applicant to have an IP rating or that such a rating would be a factor in the selection process.

3. Among other times, Plaintiff was on leave of absence from Boeing for military service from May–August 1999, and from September 17, 2001 to December 14, 2001. After the terrorist attacks of September 11, 2001, Plaintiff was called for active duty and served in several different roles, including Director of Mobility Forces assigned to the "Noble Eagle" homeland defense and with the 1st Air Force with NORAD. Plaintiff spent 2–3 days after December 14, 2001, away from Boeing at the Air Mobility Command Headquarters in Illinois.

4. From the 1990's through his retirement in April 2002, Art Meadows was the second-level manager over the Test, Safety, and Central Labs organization within Boeing's Wichita Development & Modification Center (WDMC). In this capacity, Meadows directly supervised the test pilots in Wichita. Upon his retirement, Meadows was replaced by David Canfield.

Meadows is a low-time, single-engine pilot who has never flown the KC–135 tanker.

5. Matt Archer was hired by Boeing in 1994 as an Engineer, but was reclassified in March 2001 to be a Production Transport Test Pilot. Archer is a Major in the Air Force Reserves, and is a KC–135 pilot and certified as a KC–135 Instructor Pilot (IP). Archer believes Colonel Goico to be an honest man.

6. At various times from 1996 through the present, Archer was on a military leave of absence from Boeing.

7. Joseph Goodlove is 61 years old. He worked for McDonnell Douglas (which was taken over by Boeing) for over 20 years at its Long Beach, California facility. Since 1984, Goodlove has worked as a Test Pilot. In April 2002, Goodlove accepted a test pilot position in Wichita and is presently the Chief Pilot and Chief of Flight Operations for Boeing in Wichita. Goodlove also served as a KC–135 and KC–10 pilot in the U.S. Air Force and Air Force Reserve for over 20 years. He retired from the Air Force Reserves in 1991.

Goodlove was not a graduate of test pilot school. He was not current in the KC–135 tanker when he was hired by Boeing in 2002, and he had not flown the KC–135 tanker since 1985. Plaintiff, on the other hand, was current in the KC–135 tanker and had been flying it for years. Goodlove also had not undergone PACER CRAG training before being hired. PACER CRAG is a flight management system that permits the pilot to read the instruments from a video screen. Plaintiff had undergone and successfully completed the PA-CER CRAG training in 1999 and had been flying KC–135 tankers with that system since that time. Goodlove had to be trained in the KC–135 tanker; plaintiff did not need additional training. There is no evidence that Goodlove was of Hispanic heritage.

8. Tsuyoshi Tung was hired by Boeing in Wichita in April 2002 as a Production Test Pilot. Tung is a Major in the Reserves and is a KC–135 pilot and certified as a KC–135 IP.

Tung had obtained his IP rating in the summer of 2001 before being hired by Boeing in 2002. It took him about 30 days to go through the class and pass a check ride to get his IP. Tung was born on February 14, 1967, making him 35 years old when he was hired by Boeing.

9. Earnest "Skip" Copher is 63 years old. Copher was hired by Boeing in 1988 as a Test Pilot in Wichita. He later transferred to Seattle, where he continued to fly for Boeing as a test pilot until November of 2002. Copher is a retired U.S. Air Force officer and pilot. During his 20–plus years of active duty, he served predominantly as a KC–135 pilot. He was also a KC–135 IP in the Air Force and retained that qualification throughout his employment with Boeing.

*Wichita Flight Operations.*

10. Boeing's Wichita Development and Modification Center ("WDMC") is the current name for the military side of the Boeing facility in Wichita. It is responsible for many programs that require test flight support to programs of United States military agencies. Throughout the 1990's, WDMC provided test engineers and other test personnel for these flights; however, WDMC did not have its own test pilots. When a test flight was scheduled, WDMC worked through Boeing's flight operations organization in Seattle for pilot support.

11. From the late 1990's through the end of 2001, the primary WDMC programs on which test flights were conducted involved the KC–135 aircraft. Two pilots were required for each KC–135 test flight.

Skip Copher, Charles Gebhardt, and Mark Feuerstein were the primary pilots supplied by Seattle for these test flights.

12. By early 1998, the volume of KC–135 test flights in Wichita had increased to the level that problems associated with using Seattle pilots were having a negative impact on program requirements. The Seattle pilots had test flight responsibilities in Seattle, so they were often not available to support WDMC operations on a timely basis. This required WDMC test flights to be rescheduled and generally led to program delays.

13. Additionally, WDMC had to pay for the use of Seattle pilots and the cost charged by Seattle had become excessive in the view of the Wichita program managers, whose programs and customers had to bear the costs.

14. Another problem with using Seattle pilots concerned the "currency" of pilots ratings in the aircraft. Because there were no KC–135 test flights in Seattle, the Seattle pilots often lost currency in the KC–135 between WDMC test flights. Pursuant to USAF requirements, a test pilot must complete a KC–135 landing no less often than every 45 days to stay current. If a pilot loses currency, he or she may only regain currency by flying the aircraft and getting the requisite landing under the supervision of a current KC–135 Instructor Pilot (IP).

15. Whenever a non-current Seattle pilot was used to provide support to WDMC, Art Meadows had to request that the USAF KC–135 squadron at McConnell Air Force Base make an IP available to fly at Boeing. This caused additional scheduling difficulties and often resulted in further delays.

16. As a means of mitigating some of the difficulties associated with the use of Seattle pilots, WDMC began to utilize WDMC employees who were current and qualified KC–135 pilots from the Air Force Reserves, on an as-needed, part-time basis, as co-pilots on KC–135 test flights. Seattle continued to provide a full-time Boeing pilot, who served as the pilot-in-command of the aircraft, but the second pilot position could be filled by a Wichita employee at no cost to the Wichita programs.

Plaintiff had suggested to Lea Anderson, manager of the Reduced Vertical Separation Minimum (RVSM) KC–135 certification for Boeing [one of the KC–135 projects for which WDMC was responsible], that Wichita pilots such as himself and Matt Archer be used instead of relying exclusively upon Seattle pilots.

17. Matt Archer was the first Wichita pilot used in this capacity and began flying as a part-time co-pilot around May 1998. Archer was selected primarily because he was certified as an IP and was actively flying with the Air Force Reserves. When a non-current Seattle pilot arrived to support a Wichita test flight, Archer, as an IP, could fly the test flight with him and thereby get the Seattle pilot recurrent during the test flight. This eliminated the need to obtain IP support from the McConnell AFB KC–135 squadrons.

18. In November 1998, plaintiff also began to provide part-time co-pilot support on KC–135 test flights. Plaintiff was not an IP, however, and could only be used for test flights if the Seattle pilot was current.

19. After WDMC began using Archer and plaintiff as part-time co-pilots, Skip Copher became the Seattle pilot most often used for the Wichita test flights. Charles Gebhardt flew a small number of Wichita flights after 1998, but Copher flew the vast majority.

20. The arrangement of using employees as part-time co-pilots met with strong

resistance from Ken Higgins. Higgins was the Vice President of Boeing's Flight Operations Organization in Seattle, and Meadows viewed him as the top of Boeing's flight operations chain of command. Higgins informed Meadows that he was opposed to using part-time test pilots because he considered that practice to be a safety risk. There is also some suggestion in the record that Higgins' opposition may have been part of "turf battle" between Boeing's Seattle and Wichita operations.

Higgins' objection was not based specifically on plaintiff's flying abilities. In over 30 years of flying, plaintiff had never had an accident and by everyone's account was a good pilot.

21. Meadows was hopeful that Wichita could eventually establish its own flight operations department with one or more full-time pilots permanently assigned; however, Higgins was opposed to Wichita having its own full-time pilots. In April 1999, WDMC management approved a requisition to hire a full-time pilot; however, subsequent discussions with Higgins led to the requisition being withdrawn.

22. In 2000, Meadows again tried to hire a full-time test pilot in Wichita. The requisition was approved by WDMC management and subsequently posted for interested individuals to apply. Skip Copher applied and was selected for the position; however, before Copher's selection could be processed, the requisition was cancelled without Meadows' knowledge. With the requisition cancelled, Meadows was unable to fill the position. Meadows later learned that Higgins' organization was responsible for canceling the requisition.

23. In early 2001, Meadows and Bob Potillo, WDMC engineering manager, discussed the option of reclassifying a current Boeing employee to the Production Transport Test Pilot job classification. Because reclassifications could be approved inter-nally within WDMC, this process could go forward without advance notice to or involvement with Seattle's Flight Operations organization.

24. WDMC management suspected that Higgins would not respond favorably to the reclassification move. Consequently, the decision was made to only reclassify one pilot. In March 2001, Matt Archer was reclassified from Engineer to Test Pilot. WDMC continued to use plaintiff as a part-time test pilot after Archer was reclassified.

25. Around May 2001, Meadows came under strong pressure from the KC–135 program managers. Seattle pilots were still being used for some of the KC–135 test flights and the cost and availability issues associated with Seattle pilots were still a problem. The program managers indicated to Meadows that they would consider obtaining test flight support from outside the company if the problems could not be addressed.

26. In late July 2001, Meadows traveled to Seattle to meet with Higgins about flight operations in Wichita. Because of the pressure from the KC–135 program managers, Meadows hoped to obtain Higgins' approval to hire additional full-time pilots in Wichita.

27. Higgins voiced his continued opposition to WDMC having full-time pilots and voiced even stronger opposition to WDMC's use of engineers as part-time pilots. Meadows understood Higgins' position as a mandate that Wichita immediately cease using part-time pilots.

28. In August 2001, Meadows met with plaintiff and told him that engineers were no longer allowed to fly part-time as co-pilots and that plaintiff was grounded until the issue could be resolved.

Plaintiff contends that Meadows also told him that he was working to get plaintiff into a full-time pilot position. According to plaintiff, Meadows told him that his grounding was temporary, that he would work to lift the grounding, and that he would have plaintiff hired as a full-time pilot like Archer had been hired in the spring. Meadows told plaintiff later that he had always done an excellent job for him as a pilot.

29. Because Archer was classified as a full-time pilot, he continued to take part in test flights for WDMC. The second pilot, usually Skip Copher, continued to come from Seattle.

30. By December 2001, because of internal realignment, WDMC became aligned under the Military Flight Operations organization at Boeing's Long Beach, California, facility, and was no longer subordinate to the flight operations organization in Seattle. Unlike Seattle, the Long Beach organization supported the establishment of a flight operations department in Wichita staffed with full-time pilots. Meadows understood that Long Beach shared Seattle's opposition to the use of employees as part-time test pilots, however, due to safety concerns.

31. With the approval of the Long Beach organization, WDMC submitted a requisition in January 2002 for two test pilots. With input from multiple sources, Meadows selected Joseph Goodlove and Tsuyoshi Tung to fill these positions.

32. Meadows had considered reclassifying plaintiff from engineer to pilot, and according to plaintiff Meadows told him that he would be made a full-time pilot like Archer had been. Meadows, however, opened up the two test pilot positions for the requisition and open posting process. Because Seattle no longer had authority over the WDMC, Meadows knew that Seattle would not interfere with his decision to fill these positions via the requisition and posting process.

33. In conversations with Art Meadows, Matt Archer and Charles Harley (the lead flight test engineer) made some criticisms of plaintiff's performance as a co-pilot. Meadows had not viewed these as critical problems.

From 1998 to 2001, Meadows never told plaintiff that anyone had criticized his performance. Meadows was satisfied with plaintiff's performance as a pilot from 1998–2001. He believed plaintiff had done an excellent job as a pilot for Boeing and he recommended salary increases for plaintiff. Meadows recalled Archer telling him sometime between 1998 and 2001 that plaintiff was a good pilot. Skip Copher, Larry Watson, and Charles Gebhardt all told Meadows that plaintiff was a good pilot.

34. Charles Gebhardt recommended that Meadows look outside the company for possible pilot applications rather than reclassifying plaintiff. Gebhardt thought Meadows could get outside applicants who were more qualified than plaintiff.

Gebhardt had flown with plaintiff numerous times and thought plaintiff was a good pilot. Gebhardt believed plaintiff was qualified for the test pilot position and that he would have done a good job if he had been selected. Gebhardt noted that plaintiff already worked for Boeing, which was somewhat of an asset, but that plaintiff was not an IP, which could be an important factor as far as pilots maintaining their currency.

*Reclassification of Matt Archer.*

35. Matt Archer had been reclassified on March 9, 2001. His reclassification was initiated by Art Meadows and Robert Potillo, who was the Engineer for WDMC Tanker programs, and approved by Paul

Beckmann, the Chief Engineer for WDMC.

36. Meadows and Potillo selected Archer for reclassification based on several factors, the most important of which was his current IP qualification. In Meadows' opinion, having a full-time pilot with an IP qualification was critically important because Seattle pilots were still being used to support the KC–135 test flights and their inability to maintain their currency in Seattle continued to be an issue.

Archer was considerably younger than plaintiff. Plaintiff alleges that Archer had falsified his time records on the RVSM certification training (such as by leaving work early), thereby permitting Boeing to bill the government more money. Plaintiff had reported this to Meadows, but according to plaintiff Meadows did nothing about it and seemed unconcerned.

37. Prior to Archer's reclassification, Meadows had spoken with Charles Gebhardt to get his recommendation as to whether Archer or plaintiff would be the better person to reclassify. Gebhardt is the Chief Pilot for Military Derivatives in Seattle. Gebhardt recommended Archer, citing the fact that he was qualified as an IP.

Gebhardt had told plaintiff sometime in 2001 that Boeing's pilots were getting too old, and that Boeing needed to start hiring younger pilots.

38. Meadows consulted with Boeing's Human Resources organization to see whether Archer's reclassification was permissible under Boeing policy. Stan Koehler, a Human Resources Generalist, reviewed the circumstances surrounding the reclassification and determined that it was permissible under Boeing policy.

39. Boeing procedural policy "PRO–700" (Transfer of Salaried Employees) generally governs the movement of employees from one job classification to another. For new positions, PRO–700 generally requires a competitive selection process in which information on the position is posted for five days so that interested employees may apply.

40. PRO–700 identifies certain exceptions to its general competitive selection process. One of the exceptions is set forth in Section E.1.b(3), which states that a Skills Management Team may approve an employee's reclassification within its skill boundaries when there is an interchangeability of skills and a business need, provided that the reclassification does not result in a promotion. In such cases, the posting requirements do not apply.

41. Both positions, the level 4 Engineer/Scientist position in which Archer previously worked, and the level 3 Production Transport Test Pilot position into which Archer was reclassified, fell under the Engineering Skills Team. Stanley Koehler assessed the move as lateral rather than promotional, because Archer moved from a level 4 position in one job classification down to a level 3 position in another.

42. To constitute a "promotion" under PRO–700, a change in classification must include "an increase in the employee's level of responsibility."

43. Archer's responsibilities changed as a result of the reclassification. He lost responsibilities associated with his prior position as lead safety systems engineer, while he gained some responsibilities that were unique to being a full-time pilot. Meadows did not view the change in responsibilities as an increase.

44. Blaine Knott, WDMC's Compensation Manager, evaluated Archer's reclassification to determine if a change in salary was appropriate. This inquiry focused on compensation issues and was separate

from Koehler's assessment of whether the action constituted a promotion.

45. Whenever a WDMC employee moves from one job classification to another, Knott reviews the relevant circumstances to determine whether the employee's salary is appropriate for the new classification. One relevant circumstance is the position of the employee's salary within the salary reference table for the position.

46. Boeing has established salary reference tables for each level of every job classification. Each table is bounded by 10th percentile and 90th percentile reference points. Absent unique circumstances, most salaries are expected to be at or above the relevant 10th percentile mark and no higher than the 90th percentile mark.

47. In Archer's case, Knott determined that an increase in pay was appropriate, because Archer's salary as a level 4 Engineer was below the 10th percentile mark for the level 3 Test Pilot salary range. Knott authorized an increase to bring Archer's salary up to the 10th percentile mark. Had Archer's salary as an Engineer been at or above the Test Pilot 10th percentile mark, he would not have received an increase in conjunction with the reclassification. Archer received a salary increase of more than 10 percent.

*Flight Personnel Roster*

48. WDMC's flight operations department tracks certain information, including qualifications and certification expiration dates, among others, on all of its active flight crew members. Ed Kisby, a Flight Support Specialist under Meadows, was responsible for maintaining this information. Kisby developed a database to help track this information and titled the printout from this database the Flight Personnel Roster.

49. While plaintiff was flying as a part-time pilot, he was included on the roster. Kisby was unaware that Meadows grounded plaintiff from flying as a part-time pilot in August 2001. As a result, Kisby did not remove plaintiff from the roster.

50. Following the July meeting with Higgins in Seattle, Meadows did not talk with Kisby about plaintiff's flight status. Meadows presumed that Kisby was aware that plaintiff would be grounded as a part-time pilot, because Kisby had been present at the meeting with Higgins.

51. In November 2001, Meadows became aware that plaintiff was still listed on Kisby's flight roster. At that point, Meadows told Kisby that he could remove plaintiff's name from the roster.

*Parking Lot Meeting Between Plaintiff and Matt Archer*

52. On January 12, 2002, plaintiff approached Matt Archer in the parking lot of McConnell AFB. Plaintiff and Archer were both in uniform following the completion of a weekend Air Force Reserve flight. Plaintiff wanted to inform Archer that he had recently received his qualification as a mission pilot with the Reserves. Plaintiff believed that Archer was going to be hiring test pilots for WDMC and plaintiff believed his mission pilot qualification reflected favorably on his abilities as a pilot.

At the time of this discussion, the flight was over and technically both men were on civilian status. Plaintiff had been told that Archer would be making the decision for the test pilot positions in question.

53. The following is plaintiff's account of his conversation with Archer. Archer told plaintiff there was no possibility that plaintiff would become a test pilot with Boeing. When plaintiff asked Archer to explain why, Archer told him that his accent caused problems communicating with the air traffic control tower and the

ground. Archer also told plaintiff that he (Archer) was looking for a young Air Force Reserve pilot with an engineering degree and 767 experience who was being furloughed by the airlines.[1]

54. Archer believed that plaintiff was seeking his endorsement for a pilot position at Boeing. Archer would not support plaintiff for a full-time pilot position. Boeing contends that Archer thought plaintiff's communication skills and situational awareness were deficient as compared to other pilots. Archer had never previously told plaintiff that he had any problems as a pilot.

55. Following a company investigation—and after Tung and Goodlove had been hired for the test pilot positions—Archer was reprimanded by Boeing for making the above comment relating to Boeing seeking a "young" pilot.

Plaintiff had undergone the PACER CRAG training on the new avionics equipment back in 1999 and was certified on its use. Plaintiff had been flying KC–135 tankers with the PACER CRAG equipment. Art Meadows testified in his deposition that he believed Archer and Harley had told him in early 2002 that plaintiff did not have the PACER CRAG training.

56. WDMC posted the opening in January 2002 for two Production Transport Test Pilots. Art Meadows was the manager responsible for the hiring decision.

57. As provided on the requisition, the minimum requirements for the position were an FAA ATP or commercial pilot's license with 707/KC–135 type rating, at least 1500 hours as pilot in command, and an engineering or equivalent degree. The requisition also stated that currency in the KC–135 or other Boeing aircraft was preferred.

Meadows considered a computer science degree to be the equivalent of an engineering degree.

Archer and Meadows wrote the requisition and tried to make it complete and accurate, but the skills and qualifications listed were not intended to be exhaustive. Meadows sought individuals with experience that would be beneficial to the flight operations organization. Other potentially relevant qualifications included test pilot school or test pilot experience, experience as a tanker pilot, qualification as an Instructor Pilot, preferably on an aircraft on which WDMC does flight testing, test experience with other Boeing aircraft, and FAA credentials such as Designated Alteration Station ("DAS") or Designated Engineering Representative ("DER").

58. An applicant's active flying status with the military Reserves was also considered to be a positive factor. Individuals who were actively flying with the Reserves could maintain currency independent of Boeing's test flights, which did not always occur at regular intervals.

59. At the time he submitted the requisition, Meadows hoped to hire Skip Copher for one of the positions. Meadows viewed Copher as a perfect fit for the position because he had a lot of test experience, including extensive flying in support of Wichita programs. Copher was also an Instructor Pilot, which gave Meadows ad-

---

1. Archer denies referring to plaintiff's accent, and says he told plaintiff that he thought plaintiff had problems with radio calls and often missed incoming radio calls. Archer does not deny saying that he was looking for a "young" air force reserve pilot, but says he intended this to refer to the pilot's experience, meaning a pilot who had been trained on and was proficient with recently adopted updated navigational equipment.

As defendant recognizes, for purposes of summary judgment the court must accept plaintiff's version of the conversation as true.

ditional flexibility in manning crews and maintaining pilot currency.

61. At Meadows' direction, Matt Archer and Charles Harley separately reviewed each applicant's resume to identify which applicants possessed the relevant skills and experience for the position. They agreed that seven applicants, including the plaintiff, met the minimum requirements for the position. Archer and/or Harley ranked the seven candidates. They ranked Skip Copher and Joseph Goodlove as the most qualified and plaintiff as the least qualified among the seven.

62. Harley is the lead flight test engineer within WDMC's flight test organization and flew with plaintiff numerous times on Boeing test flights. Harley also has his commercial pilot's license and is certified as a flight instructor.

Plaintiff claims to have personal knowledge that Harley cheated on his time records by leaving work early and billing for a full day's work.

On January 7, 2002, Harley forwarded an e-mail to a number of people, including plaintiff, which contained an editorial column allegedly from a local newspaper. The article was entitled "Immigrants, Not Americans, Must Adapt." In the article, the author stated that he was tired of the nation worrying about whether it was offending some individual or their culture with post–9/11 patriotism. He said he was not against immigration or anyone seeking a better life by coming to America, but "there are a few things that those who have recently come to our country, and apparently some born here, need to understand. This idea of America being a multi cultural community has served only to dilute our sovereignty and our national identity. As Americans, we have our own culture, our own society, our own language and our own lifestyle. * * * We speak ENGLISH, not Spanish, Arabic, Chinese, Japanese, Russian, or any other language. Therefore, if you wish to become part of our society, learn the language!" It further stated in part: "We are happy with our culture and have no desire to change, and we really don't care how you did things where you came from. This is OUR COUNTRY, our land, and our lifestyle. Our First Amendment gives every citizen the right to express his opinion and we will allow you every opportunity to do so. But, once you are done complaining, whining, and griping about our flag, our pledge, our national motto, or our way of life, I highly encourage you to take advantage of one other great American freedom, THE RIGHT TO LEAVE." Plaintiff complained to Boeing about the e-mail, and Harley was later reprimanded over the incident.[2]

---

2. Plaintiff also asserts that Harley "did not like me because I refused to falsify my time records" and "does not like people of Hispanic heritage and frequently made jokes about Hispanics in my presence." Goico Affidavit, ¶ 14. As defendant points out, however, plaintiff has failed to support these conclusory allegations with any supporting evidence. In his deposition testimony, for example, plaintiff cited one comment allegedly made by Charles Harley and Skip Copher in 1999 or 2000 about "hyphenated Americans," which plaintiff took as a put-down, but plaintiff apparently could not recall the context or nature of the statement. Plaintiff Depo. at 87–89. Plaintiff testified that he told Harley he did not like those remarks. When asked if the men quit making such remarks, plaintiff testified, "Even though subsequent to that, there have been some remarks that were not made directly to me. I did hear conversations among some of the other crew members that I thought were not appropriate, but they were not directed at me." Id. at 90. When asked to relate such comments, plaintiff testified that he could not remember who it was or what was said except that "I recall sometimes being in the operation room where there have been some conversations which I didn't thought [sic] was appropriate." Id. at 91.

63. Harley says he thought plaintiff lacked any qualifications that set him apart from the other candidates. He recognized that plaintiff had a lot of hours in the KC–135, but contends that additional hours beyond a threshold amount are not necessarily indicative of a better pilot.

64. Harley contends his experiences flying with plaintiff led him to believe that plaintiff lacked situational awareness as compared to other pilots. He claims plaintiff was sometimes inattentive and lost focus on required duties, and that he missed radio calls to a greater degree than other pilots. Harley contends he saw plaintiff appear indecisive during a routine situation resulting from a loss of power during a test flight, and that on another occasion plaintiff was talking to another crew member about something unrelated to the flight and failed to react from instructions from the pilot-in-command to lower the landing gear.

Plaintiff disputes all of the foregoing assertions. He denies missing more radio calls than other pilots, and states that the incident alleged by Harley (and Archer) concerning the landing gear never happened. Both parties cite flight logs in an effort to bolster or discredit their claims concerning the landing gear incident, but the records presented are inconclusive. At this stage, plaintiff's testimony is sufficient to demonstrate the existence of a genuine issue of fact concerning the incident. Accordingly, for purposes of summary judgment the court accepts plaintiff's assertion that the incident never happened.

65. Harley contends that he thought plaintiff was good at flying the airplane, and that he felt comfortable with plaintiff as a co-pilot because there was always a full-time Boeing pilot as pilot-in-command. Harley never mentioned to plaintiff any problems with plaintiff's abilities as a pilot.

66. Matt Archer, like Harley, contends that plaintiff lacked qualifications or experience that distinguished him from the other candidates. As a Boeing pilot, Archer flew with plaintiff on a handful of occasions between March and June of 2001 after Archer was reclassified to a full-time test pilot position.

At the time Archer ranked plaintiff last out of the seven candidates for the test pilot position, Archer was aware that plaintiff had complained to Boeing of age and national origin discrimination. 67. Archer contends that plaintiff missed radio calls and inter-cockpit communications at a greater frequency than other pilots. He also contends plaintiff was less aware of his surroundings and slow to react to unexpected or changed circumstances. He contends that he had to provide plaintiff with more instruction and assistance in operating the KC–135's electronic navigation system than with other pilots.

In his deposition, Archer could not recall any specific details concerning missed radio calls by plaintiff, and admitted that he himself had missed radio calls. Additionally, Archer admitted that on one occasion he (Archer) made a mistake during flight testing by exceeding the "angle of attack" limit and nearly stalled a KC–135 tanker. A stall is dangerous and can lead to loss of control of the aircraft or catastrophic failure of the structure during recovery efforts.

68. Archer had experience flying and working in the Reserves with Tsuyoshi Tung. Archer found Tung to be a very

When asked whether he recalled anything about what the remarks were, plaintiff gave an essentially non-responsive answer: "This occurred earlier. There was some conversation to these effect [sic]. I realized that my position in flight test was tenuous." *Id.*

proficient pilot and hard worker. Archer and Tung are friends.

69. Archer claims that when he flew with plaintiff, he felt like he was doing a disproportionate amount of the work, because he was handling his job duties while also handling some of the duties for which plaintiff was responsible. Archer contends he did not experience this with other Boeing pilots.

Archer and plaintiff only flew together three times at Boeing.

70. Archer mentioned his criticisms to Art Meadows in 2001, but he did not pursue the matter further at that time. Archer viewed plaintiff as a good stick-and-rudder pilot [i.e. he was good at controlling the aircraft] and Archer did not view his criticisms as mission-critical issues. Additionally, plaintiff was Archer's senior officer and former commanding officer in the USAF Reserves, and Archer did not want to make a big deal out of issues that were not mission critical.

71. Meadows reviewed the rankings provided by Archer and/or Harley and discussed each candidate's qualifications. They ranked Skip Copher and Joseph Goodlove first and second, respectively. They ranked Tsuyoshi Tung fifth and plaintiff seventh.

Archer and/or Harley told Meadows that plaintiff did not have PACER CRAG training, when in fact he did. By this time, Archer was aware that plaintiff had complained about Archer's age-based comment and the alleged comment about his accent. Archer was "upset" and "shocked" that plaintiff had lodged a complaint of discrimination against him.

72. Goodlove had a tremendous amount of test experience for Boeing in a variety of different aircraft. He was current and qualified in the KC–10, which meant he could be put to immediate use on a KC–10

program that was scheduled for flight testing in Wichita later in 2002. Additionally, Goodlove was certified as a Designated Engineering Representative (DER), which was beneficial, because it gave him immediate credibility with the Wichita FAA office.

Goodlove was not current in the KC–135. Additionally, he did not have the PACER CRAG training that plaintiff had. Goodlove was not Hispanic.

73. Charles Gebhardt of Boeing also provided input to Meadows regarding the pilot positions. Gebhardt is Boeing's Chief Pilot for Military Derivatives in Seattle. Gebhardt had told plaintiff that Boeing needed to start hiring younger pilots.

74. At Meadows' request, Gebhardt reviewed the resumes of the seven qualified applicants. Gebhardt had flown with Goodlove before and highly recommended him to Meadows because of his test experience with Boeing, his DER certification, and his KC–10 qualification. Gebhardt was aware of the KC–10 program that was scheduled for flight testing in Wichita.

Gebhardt admits that plaintiff was better qualified in the KC–135 than Goodlove.

75. At Meadows' request, Don Brown also provided input on the applicants for the two pilot positions. Brown is the Flight Operations Director for Boeing in Long Beach.

76. At Brown's request, Mike Fahrney reviewed the resumes of the applicants for the two pilot positions. Fahrney works under Brown as the Military Flight Operations Manager in Long Beach. Fahrney is also a test pilot for Boeing.

77. Fahrney considered a variety of factors to be relevant for the test pilot position, including experience as a test and/or tanker pilot, qualification as a KC–135 Instructor Pilot, test experience with

other Boeing aircraft, and certification as a Designated Engineering Representative (DER). Fahrney also focused on recency of flight experience. In Fahrney's opinion, all other things being equal, a candidate with more recent experience is more valuable than someone whose experience is many years old.

Plaintiff flew 16 missions after the September 11, 2001, terrorist attacks. Goodlove flew none in the KC–135 tanker.

79. Fahrney grouped the applicants into one of three categories: good, marginal, and not qualified. Good candidates were those that possessed many or all of the desired qualifications and/or experience. Marginal candidates were those who met the minimum qualifications, but possessed less of the desired qualifications than those individuals in the good category.

80. Fahrney placed five applicants in the good category and ranked them as follows: (1) Skip Copher; (2) Joseph Goodlove; (3) Tsuyoshi Tung; (4) Steven Larkins; (5) Andris Litavniks. Fahrney placed plaintiff in the marginal category.

81. Fahrney ranked Copher first because of his test experience with Boeing and IP qualification. Fahrney also knew that Copher had frequently supported Wichita flight operations and had heard good comments about Copher's performance.

82. Fahrney rated Goodlove highly primarily based on his broad base of Boeing test pilot experience, KC–10 experience, and DER certification. Fahrney was aware that Wichita had a KC–10 program that was going to require flight testing later in 2002, so Goodlove's KC–10 background was particularly helpful. The DER certification was not a requirement for the position, but Fahrney viewed it as a tremendous advantage, because it gave

him instant credibility with the FAA in Wichita.

83. Fahrney ranked Tung third primarily based on his KC–135 IP qualification and the recency of his KC–135 experience. Fahrney viewed Tung's IP qualification and active flying status in the Reserves as particularly important. By actively flying with the Reserves, Tung would be able to maintain his currency during times when Boeing's test flight schedule was light. As an IP, Tung would give the flight operations department more flexibility in pilot assignments, especially during light flight schedules. Fahrney also viewed Tung's experience as a flight engineer with United as a positive factor. Working for United gave Tung a broader experience base and exposed him to cutting-edge avionics and equipment that had not yet made it to the older derivative aircraft like the KC–135 and KC–10.

84. Fahrney graded plaintiff as a marginal candidate. Although plaintiff met the minimum requirements and had a lot of hours in the KC–135, he lacked many of the factors that Fahrney thought important, including IP qualification and recency of experience. Fahrney believed—perhaps incorrectly—that plaintiff lacked recency of experience based on his rank (Colonel) and his recent assignments in the Reserves. In Fahrney's experience, senior officers usually had a less active flying schedule than more junior officers. Fahrney noted from plaintiff's resume that his recent assignments, including for example, Wing Vice–Commander and Deputy Group Commander, appeared to involve much more work on the ground than actual flying.

85. Fahrney discussed his review and rankings with Brown. Brown agreed that the factors on which Fahrney conducted his review were relevant and concurred

with Fahrney's rankings. Brown spoke with Art Meadows about the applicants. Brown did not provide his ranking of the applicants to Meadows. Rather, Brown accepted and gave his "tacit approval" to the ranking of the applicants that was provided to him by Meadows.

86. At the time, neither Brown nor Fahrney were aware of plaintiff's complaints of discrimination. Similarly, neither Brown nor Fahrney were aware of the criticisms concerning plaintiff's communications skills and/or co-pilot abilities.

87. Meadows initially selected Copher for one of the positions and transmitted an offer to him on February 18, 2002. Before an offer regarding the second pilot position was extended, Meadows learned that Copher's offer had been declined, because Copher's management in Seattle would not release him to accept the position in Wichita.

88. Based in part on input from Brown, Gebhardt, Archer and Harley, Meadows selected Copher and Goodlove as the two most qualified candidates. By the time all of this input was received, however, Meadows learned that Copher's management would not allow him to take the job.

89. Meadows selected Goodlove for an interview on February 26, 2002, and the interview was subsequently held on or about March 12, 2002. Goodlove was offered one of the positions on March 18, 2002.

90. In assessing who was the most qualified candidate, Meadows was cognizant that Goodlove would require some refresher training in the KC–135 because he was not current and qualified in that aircraft. The possibility existed that the WDMC flight operations department would have to provide Goodlove's training. If that occurred, Archer, who was the only IP in Wichita, would be the only one who could provide the training. This concerned Meadows, because Archer would not be able to maintain his normal job duties if he was the only person to get Goodlove requalified in the KC–135.

91. Another consideration was the additional flexibility that a second IP would provide. Pilots from Seattle continued to support WDMC programs and pilots from Long Beach would soon be providing similar support. Like Seattle, the Long Beach pilots were not current in the KC–135 and would therefore need to fly with an IP.

92. Meadows testified that for these reasons, he determined that an additional KC–135 IP was necessary.

93. Meadows considered Andris Litavniks, who was initially ranked third on the list, but ultimately declined to extend him an offer. After the initial rankings, Meadows learned that Litavniks was not a United States citizen, which would have caused potential difficulties with him working on classified military programs. Litavniks was also not certified as an IP on the KC–135.

Litavniks had no experience in the KC–135 tanker and did not have an engineering degree.

94. Meadows next considered Steven Larkins, who was initially ranked fourth on the list, but also declined to extend him an offer. Larkins was certified as an IP but not on the KC–135 aircraft.

95. Tsuyoshi Tung was the next highest rated person on the list. Tung was certified as an IP on the KC–135 and was also actively flying in the Reserves. Meadows selected Tung for an interview on February 26, 2002, and the interview was subsequently held on or around March 12, 2002. Tung was formally offered one of the positions on or about March 18, 2002.

*Plaintiff's Internal and External Discrimination Complaints.*

96. Plaintiff first complained about alleged discrimination on January 28, 2002, in an e-mail to Art Meadows. Based on his parking lot conversation with Archer, plaintiff alleged discrimination on the basis of national origin, age, and military status for "removing [him] from flight status, denying [him] selection as a pilot and Wichita chief pilot, and before the selection even starts, telling [him] that [he] was not eligible for any future flying positions." Plaintiff further alleged that he was told he "did not have any possibility of ever flying again with Boeing."

97. During a telephone conversation on January 24, 2002, Meadows told Goico that he was not eligible to apply for the position. Plaintiff was very unhappy with Meadows' and Archer's statements and thought that he should be permitted to apply. Meadows relented during a meeting with plaintiff on January 28th and told him that he could apply.

98. Plaintiff met again with Meadows on February 7, 2002. According to plaintiff, Meadows said with regard to plaintiff's complaints of discrimination that "I am sorry to see you take that stand. As an engineer you had a good potential at Boeing with your DAS experience and flying time." Plaintiff took the remark that he "had" a good career as a threat.

99. At no point did Meadows ever make any comments directed at plaintiff's age or otherwise indicate that age was a factor in the pilot selection process.

According to plaintiff, Meadows told him that he (Goico) had a problem understanding and communicating in English.

100. On February 12, 2002, plaintiff filed an internal complaint with Boeing's Equal Opportunity/Workforce Diversity ("EO/WD") organization. Plaintiff reiterated his allegations of discrimination on the basis of national origin, age, and military status for "removing [him] from flight status, denying [him] selection as a pilot and Wichita chief pilot, and before the selection process event starts, telling [him] that [he was] not eligible for any future flying positions."

101. Plaintiff identified four Boeing employees as being involved with his complaint of discrimination: Art Meadows, Matt Archer, Charles Harley, and Skip Copher.

102. Mary Avila, Boeing's EO/WD investigator, conducted an investigation into plaintiff's allegations.

103. She completed her investigation in June 2002, concluding there was insufficient evidence to substantiate plaintiff's allegations of discrimination. During her investigation, Avila determined that Chuck Harley violated Boeing's policies regarding the use of electronic mail and that Matt Archer made an improper age-related statement while talking with plaintiff. Avila referred these instances to Boeing's Human Resources Department in June 2002 for evaluation and potential corrective action.

Avila did not interview Archer until the first week of April 2002, after the two pilot positions were filled.

104. In July 2002 Harley received a written Correction Action Memorandum for his improper use of the Boeing e-mail system, while Archer received a verbal reprimand for his comment.

105. On April 16, 2002, plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and Kansas Human Rights Commission (KHRC). In support of his factual allegations, plaintiff provided copies of the intake questionnaire he had filed regarding his internal Boeing complaint

and the documents he had provided to Avila.

106. In 1999 or 2000, plaintiff heard Copher and Harley make comments that plaintiff viewed as derogatory towards Hispanics, although plaintiff could recall no specifics about the comments. Plaintiff confronted the two men and told them the comments were inappropriate. Neither Copher nor Harley ever again made a derogatory comment to plaintiff regarding his national origin.

*Other Positions at Boeing*

107–143. Boeing has set forth in its brief a number of facts relating to plaintiff's application for several other positions at Boeing in 2002 after the two pilot positions were filled. These other positions included: Engineer/Scientist Manager, Strategy Analyst Specialist Manager, Marketing and Sales Representative, Marketing and Sales Process Specialist, Marketing and Sales Representative Manager, Program Management Specialist, and Test Pilot Position.[3] Plaintiff was not offered any of these positions.

Nearly all of the material facts relating to the failure to hire plaintiff for these other positions are uncontroverted, and the court deems it unnecessary to repeat them here.

*2003 Retention Exercise*

144–164. Boeing's brief contains a number of facts relating to plaintiff's retention rating. The court concludes the following summary is sufficient for purposes of summary judgment. Pursuant to a collective bargaining agreement (CBA), Boeing periodically assigns a retention rating for all represented employees of the Wichita Engineering Unit of the engineer's union (SPEEA), including the plaintiff.

The rankings are determined collectively by a group of managers, and are compiled through a process that assesses the relative position of each employee within a group of other employees in the same job classification and skill management code. The groups often contain employees who report to different managers, sometimes in different organizations. In determining the rankings, the reviewing managers focus on performance, but also take into account other factors including how critical the employee's skills are. The goal is to determine which employees the company could least afford to lose if layoffs were required.

Within each retention group, employees are assigned one of four retention categories—R1 to R4—with R1 being the highest. The assignments must conform to a forced distribution that requires approximately 25% representation in each category. For example, in a retention group with six employees, there must be at least one person in each category and no more than two in any category. In certain situations, an employee's retention rating is automatically adjusted upward at the end of the exercise. For example, an if an employee with more than 20 years of service is rated in the R4 category, he is automatically adjusted upward to an R3. If layoffs are required, the employee has the same rights as any other R3 employee.

Retention ratings only become important if layoffs are required within a particular skill group. The CBA generally requires employees with lower retention ratings to be laid off before higher rated employees. Absent a layoff, the ratings have no impact on an individual's employment with Boeing. They are not taken

---

**3.** This position was posted on February 11, 2003. Plaintiff concedes he did not meet the qualifications of the position, one of which required that the candidate be a graduate of an approved Test Pilot School.

into account in determining work assignments, pay, or promotional opportunities. Although plaintiff contends that employees with higher retention ratings tend to get better raises, such a fact is not evidence that the ratings themselves are taken into account in determining pay. Rather, it may reflect only the underlying reality that better-performing employees with more valuable skills tend to receive better raises than other employees.

Boeing conducted retention exercises in 2003, 2001, 2000, 1999, 1997 and 1996. Plaintiff was rated R4 in 1996. In subsequent exercises, he was rated R3 up until the 2003 exercise, when he was initially rated R4. Because he had over 20 years experience, however, his rating at that point was automatically raised to R3.

In 2000, plaintiff was ranked 5th out of 6 employees in his group. In 2001, he was ranked 7th out of 9 in the group. In 2003, plaintiff was ranked 6th out of 6. Two of the managers who contributed to plaintiff's 2003 ranking were aware that plaintiff had filed a discrimination complaint. Two other contributing managers were unaware of this fact.

There have been no layoffs in plaintiff's group since the 2003 exercise and none are presently expected.

*Vandalism to Plaintiff's Vehicles*

165–167. In June 2000 and again in April of 2002, Plaintiff had a vehicle vandalized in the Boeing parking lot. Although plaintiff suspects that one or more individuals from Boeing's flight test group are responsible for these acts, he admits he has no evidence to support that suspicion.

*Certification as DAS Coordination Engineer*

168–184. John Lee is the manager in charge of the Designated Alternation Station (DAS) office for Boeing in Wichita and serves as the DAS Administrator. The DAS office is responsible for coordinating, overseeing, and certifying, on behalf of the FAA, all aircraft modifications performed by Boeing in Wichita. Most engineering employees in the DAS office hold DAS Authorized Representative (AR) appointments as Coordination Engineers or as Coordination Engineer Candidates. These appointments are based on DAS or FAA need and criteria identified in FAA command media and by following a FAA approved process. Plaintiff is presently a Coordination Engineer Candidate.

Before being appointed as a full DAS AR, it is common for employees to serve a period as a Candidate. There is no minimum or maximum amount of time spent as a Candidate; the time varies depending on the experience and proficiency of the employee.

A DAS engineer certification is simply a title used between Boeing and the FAA. It has no impact on an individual's employment with Boeing. Lee issues job assignments within the DAS office based on each employee's abilities. An employee's status as an AR, AR Candidate, or neither, is not a factor. Plaintiff did not lose any job opportunities as a result of his continued status as a Candidate. Lee makes annual salary recommendations for his employees in accordance with Boeing's guidelines, which focus primarily on performance. Whether an employee is an AR or AR Candidate is not a major factor in these decisions.

Plaintiff became a Coordination Engineer AR Candidate in 2000. Around January of 2001, plaintiff requested and completed the package of paperwork that must be completed before an individual may be nominated to the FAA as a fully certified Coordination Engineer. On several occasions in 2001 and 2002, Lee asked plaintiff to resubmit certain documents that were a

part of this package, because Lee could not readily locate the ones previously submitted. Unlike certain technical discipline AR appointments, there was no urgency associated with the review and submitting of plaintiff's documents. There was no requirement of immediate certification, there were other higher priority issues taking place, and most importantly, Lee felt that plaintiff needed additional experience with various stages of certification process.

In January 2003, the process used to fully certify DAS candidates was primarily based on the recommendation of AR's familiar with the applicant's certification work and the recommendation of the DAS Administrator. As the DAS Administrator, Lee personally monitored each candidate's progress where possible and also received reports and recommendations from existing AR's. Lee did not recommend anyone for full AR status until he felt they were ready.

Individuals interested in becoming an AR or AR Candidate could request the application paperwork at any time; however, there would need to be an AR recommendation to document the applicant's technical and FAA certification knowledge and experience, among other requirements. Completion of the application paperwork was a necessary prerequisite; however, completion of the paperwork did not grant AR status or guarantee an appointment. Appointments are based on need as well as the candidate's ability to meet the required qualifications.

In March 2003, pursuant to directives from the FAA, the DAS office changed the manner in which it makes appointments. Under the new process, most candidates are required to go before an evaluation panel that assesses the candidate's suitability and qualification for addition to the DAS staff. Individuals who currently hold FAA designee authorizations (e.g., Designated Engineering Representatives (DER)) are normally exempt from the evaluation panel requirement.

The evaluation panel that reviewed plaintiff was composed of Lee, Dave Horn (Asst. DAS Administrator), Ron Dyke (Technical Advisor), and Carl Crowdis (Technical Advisor). The panel members took turns asking plaintiff questions regarding many aspects of the certification process. Immediately following the completion of the evaluation, the panel members met and discussed their assessment of plaintiff's readiness for a full AR Coordination Engineer position. The panel unanimously agreed that plaintiff was not ready for a full position and needed to continue in his capacity as a Candidate to gain more experience.

A young female employee, Deborah Hoppas, was certified as a DAS engineer in a very short period of time. Ms. Hoppas is in her twenties and has worked at Boeing a short period of time.

The DAS office is in the process of implementing a mentoring program in several DAS disciplines. In conjunction with its recommendation that plaintiff continue as a candidate, the evaluation panel assigned Ron Dyke and Dave Horn to serve as mentors for plaintiff's certification efforts. Plaintiff was instructed to work with Dyke and Horn to establish a plan to gain the experience needed and to address the issues noted during the interview. At Lee's request, plaintiff clarified an item on his resume after Lee expressed concern that it could be misconstrued as overstating plaintiff's experience.

*Plaintiff's Additional Statement of Facts*

1. Goico wrote a memo of his meeting with Archer on January 12, 2002, and gave a copy of the memo to Meadows.

2. Archer wrote a memo on January 28, 2002, about his January 12th meeting with Goico, and it is obvious that Archer had Goico's memo because Archer referred to it at the beginning of his response memo. Archer got Goico's memo from Meadows.

3. Meadows would not have recommended Goico for a part-time test pilot position with Boeing nor processed the approval to use Goico as a test pilot in the KC–135 with Boeing's government flight representative in 1998 if he had not believed that Goico was a good pilot.

4. Meadows admitted in his deposition that he has no idea of how many flights Goico flew for Boeing from 1998 to 2001, when his flying status was terminated.

5. Meadows was Goico's direct supervisor while Goico performed flight test services for Boeing, but he does not specifically recall preparing any evaluations of Goico's performance. However, Meadows admits that while Goico was under his supervision and performing flight tests for Boeing, he never told Goico that he was not performing satisfactorily or that he was a bad pilot.

6. Although Meadows does recall Archer complaining to him about Goico missing a radio communication during a flight with Archer, Meadows has stated that he was not deeply concerned about the incident at the time.

7. Meadows broadly estimated that Goico flew anywhere from 10 to 150 flights for Boeing.

8. Meadows is aware that Goico has taken and passed Boeing's pre-management assessment test, required by Boeing for all of its employees who wish to apply for management-level positions. Archer and Tung have not taken this test.

There is no evidence that the pre-management test was a relevant consideration in the selection process for the non-management test pilot positions.

9. Concerning the hiring of full-time test pilots for Boeing–Wichita, Meadows admitted in his deposition that experience in the KC–135 was an important qualification for the candidates.

10. Goico had more overall flying time than Tung, in addition to more flying time in the KC–135 by far and more years of service at Boeing.

11. Although Meadows' current position is that an IP rating was a critical qualification for the test pilot position, he never talked to Goico about getting his IP rating.

12. After Meadows learned that Goico had made an allegation of an age-based comment by Archer, Meadows called Archer into his office on January 28, 2002, to discuss Goico's allegation.

13. Meadows also met with Goico concerning his complaint, and said that Goico had done an excellent job as a pilot for Boeing. Meadows recalled that Goico told him at this meeting that Archer could not give Goico any specific examples of when he had performed badly as a test pilot, and Meadows stated in his deposition that he would not have had any examples of performance issues to give to Goico either.

14. Meadows retired in May of 2002. He did not know that Archer was reprimanded in July of 2002 for his prior age-based comments to Goico.

15. Archer has criticized Goico's PACER CRAG skills, claiming that he was slow to learn the system. Archer claimed he had to spend extra time training plaintiff, that it took plaintiff longer to learn the system than some other pilots, and that plaintiff was uncomfortable with flying the right seat, where he would be the PACER CRAG operator.

16. Archer has criticized Goico for missing radio calls during flights when co-piloting, but during his deposition he was unable to provide any specific incidents when Goico missed a radio call. Archer also admitted that he had missed radio calls during flights.

17. Archer admitted that he had used the term about hiring "younger pilots" during his conversation with Goico on January 12, 2002. Archer denied in his deposition that he had Tung, a young pilot, in mind when he made the comment to Goico on January 12, 2002. However, he admits approaching Tung around Christmastime 2001 to encourage him to apply for the pilot job. Archer also encouraged several other people to submit resumes.

18. Archer admits telling Goico that his aircraft control skills were excellent.

19. Archer denies that he thought Goico's discrimination charge might affect his career at Boeing.

20. Archer is the one who created the matrix to rank the applicants, not Meadows.

21. Meadows decided not to grant Goico a personal interview for the test pilot positions.

22. Archer never saw a written ranking of the applicants from Meadows.

23. Archer admits that Goico was a hard worker.

## II. *Boeing's Motion for Summary Judgment.*

Plaintiff claims he was discriminated against in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e); 42 U.S.C. § 1981; the Uniformed Services Employment and Reemployment Rights Act (38 U.S.C. § 4301) ("USERRA"); the Kansas Act Against Discrimination (K.S.A. § 44–1001) ("KAAD"); and the Kansas Age Discrimination in Employment Act (K.S.A. § 44–1111) ("KADEA"). His complaint specifically alleges age discrimination (Count I), national origin discrimination (Count II), veteran discrimination (Count III), and retaliation (Count IV).

Boeing contends it is entitled to summary judgment on all of these claims. It first argues plaintiff has failed to establish a prima facie case of retaliation because plaintiff has not shown he suffered an adverse employment action or has failed to show a causal connection between an adverse employment action and his discrimination complaint. Even if there is a prima facie case of retaliation, Boeing argues, plaintiff has not shown evidence that Boeing's stated reasons for its decisions are pretextual. Boeing similarly argues that plaintiff fails to show pretext with respect to its decision to reclassify Matt Archer as a test pilot instead of plaintiff. Next, Boeing contends plaintiff's USERRA claim fails because there is no evidence that plaintiff's military service was a substantial or motivating factor in Boeing's decisions. With regard to plaintiff's age discrimination claim, Boeing concedes its selection of Tung over plaintiff in 2002 gives rise to a prima facie case, but argues there is no evidence that Boeing's stated reason was a pretext for discrimination. It argues that plaintiff's reliance upon Matt Archer's statement about looking for a "young" pilot is misplaced, because the hiring decision was made by Art Meadows, and Boeing contends there is no evidence that Meadows "rubber-stamped" Archer's input. Boeing further argues that Meadows' use of applicant rankings, which were compiled from several sources, shows that merit rather than age was the basis for its decision. Finally, Boeing argues that plaintiff's claim of national origin discrimination fails because Boeing has demonstrated a legitimate non-discriminatory reason for its action.

### III. *Summary Judgment Standards.*

■■■ A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). A "genuine" issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. An issue of fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56, the moving party initially bears the burden of making a prima facie showing of the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. *See Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim. *Id.* at 671 (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Because it is the role of a jury to resolve any conflicts in the evidence, the court must examine the evidence on a motion for summary judgment in the light most favorable to the non-moving party. *Jones v. Unisys Corp.,* 54 F.3d 624, 628 (10th Cir.1995).

■■■ When a plaintiff relies upon circumstantial evidence to support a claim of intentional employment discrimination, courts typically analyze the claim under the burden-shifting test of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that test, the plaintiff first has the burden of presenting evidence of a prima facie case showing that an "adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1227 (10th Cir.2000) (*quoting Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If a prima facie case is established, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action...." *Perry v. Woodward,* 199 F.3d 1126, 1135 (10th Cir.1999). If the defendant does so, the plaintiff can avoid summary judgment "only if [he] is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." *Id.* To establish pretext, a plaintiff must show either that "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "A plaintiff may accomplish this by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997) (quotation and citation omitted).

### IV. *Discussion.*

#### A. *Age and National Origin Discrimination Claims.*

■■■ Under the ADEA and Title VII it is unlawful for an employer to fail or re-

fuse to hire an employee or to otherwise discriminate against the employee with respect to compensation, terms, conditions, or privileges of employment, because of the employee's age or national origin. 29 U.S.C. § 623(a); 42 U.S.C. § 2000e–2(a).[4] Section 1981 of Title 42 further provides that "all persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts ... as is enjoyed by white citizens...."[5]

■ 1. *January 2002 Test Pilot Positions.* Boeing concedes plaintiff has stated a prima facie claim of age discrimination regarding its selection of Tsuyoshi Tung over plaintiff for one of the January 2002 test pilot positions, but argues there is no evidence that Boeing's explanation for its decision is a pretext. It similarly concedes there is a prima facie case of national origin discrimination regarding its selection of Tung and Joseph Goodlove for the January 2002 positions, but again argues there is no evidence of pretext. After considering all of the evidence in the light most favorable to plaintiff, the court concludes there are inconsistencies and weaknesses in Boeing's explanation for its failure to hire the plaintiff for these positions such that a reasonable jury could find that the explanation is not worthy of credence. While no single factor is dispositive, the cumulative circumstances cited by plaintiff—some of which are outlined below—could persuade a jury that Boeing's stated reasons are not credible.

Plaintiff has cited evidence that when he and Archer worked as part-time test pilots, Art Meadows assured them he would work to get them full-time pilot positions. Meadows subsequently re-classified Archer as a full-time pilot without publishing the position and without a competitive process, but when Meadows obtained authorization for two additional positions in January of 2002, he decided to publish the positions and to take applications rather than merely reclassifying plaintiff. Plaintiff has cited evidence that two of the individuals who provided input to Meadows concerning these positions (i.e., Charles Gebhardt and Matt Archer) made statements to the effect that Boeing should hire a younger pilot. There is evidence that before the selection process even began, Archer told plaintiff that he was not eligible to apply and that plaintiff had no possibility of ever flying for Boeing in the future. He also told plaintiff that Boeing was seeking a young Air Force Reserve pilot for the position. A jury could find that this evidence tends to suggest plaintiff's age was a factor in the decision not to offer him the test pilot position given to Tung. Archer also allegedly told plaintiff that his accent was a problem and that Skip Copher and Charles Harley believed plaintiff's accent caused difficulty in communicating with air traffic control and ground control. Plaintiff cites evidence that his accent caused no such difficulty. Plaintiff also cites evidence that despite Meadows' prior representations that he would work to get plaintiff a full-time pilot position, Meadows told plaintiff on January 24, 2002, that he was not eligible to apply for such a position. Meadows subsequently

4. For purposes of the instant opinion, the court's discussion of these federal statutes applies equally to the corresponding state statutes (the KAAD and the KADEA).

5. Although strictly speaking § 1981 does not prohibit discrimination based on national origin, *see St. Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), plaintiff's allegations appear to state a claim under § 1981 for discrimination based on ancestry or ethnic characteristics. *See Complaint,* ¶ 20 (Plaintiff "was not promoted because of his Cuban ancestry and purportedly because [of] his accent....")

relented and allowed plaintiff to apply, but plaintiff cites evidence from which one could infer that Meadows was later upset over the fact that plaintiff's lodged a discrimination complaint against Matt Archer. Plaintiff testified that Meadows also told him that he had a problem understanding and communicating in English. Additionally, plaintiff cites evidence that Charles Harley—who helped Archer rank the candidates—circulated an e-mail around Boeing in January of 2002 that could reasonably be construed as exhibiting animosity toward immigrants such as the plaintiff. If a jury were to believe plaintiff's evidence that his accent was not a detrimental factor in his job performance, then comments to the contrary by Archer, Harley and Meadows, together with the other evidence noted above, could be viewed by the jury as evidence of pretext or of animus against plaintiff on account of his national origin. *Cf. Carino v. Univ. of Okla. Bd. of Regents,* 750 F.2d 815, 819 (10th Cir.1984) (a foreign accent that does not interfere with a Title VII claimant's ability to perform duties of the position he has been denied is not a legitimate justification for adverse employment decisions).

Although Boeing contends Meadows was the sole decision-maker concerning the test pilot positions—and that any evidence of Archer, Harley or Gebhardt's conduct is thus irrelevant—plaintiff has cited evidence that Meadows was not fully aware of the respective qualifications of the applicants and that he relied heavily—and in some matters entirely—upon the recommendations, representations, and rankings of the aforementioned individuals in refusing to hire plaintiff for the position. *Cf. Kendrick v. Penske Trans. Services, Inc.,* 220 F.3d 1220, 1231 (10th Cir.2000) (recognizing decisions where a defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the "cat's paw," for a subordinate employee's prejudice, even if the manager lacked discriminatory intent). For example, there is evidence that Archer and/or Harley represented to Meadows that plaintiff did not have PACER CRAG training, an important skill for the pilot position, when in fact he did. There is evidence that Archer and Harley criticized plaintiff's flying skills to Meadows, although they never said anything to plaintiff about these alleged deficiencies and were generally unable to provide specific instances of poor performance. There is some evidence that Meadows—who was not a KC–135 pilot—more or less adopted the rankings or assessments put forth by Archer and Harley. There is evidence that Archer, as the "lead" test pilot in Wichita, had a significant say in who would be hired for the January 2002 positions. Also, Archer provided his input to Meadows—and together with Harley ranked plaintiff last out of the seven qualified candidates—shortly after learning that plaintiff had complained to Boeing about Archer's allegedly discriminatory comments, a complaint which "upset" and "shocked" Archer. There is evidence that Meadows himself was unhappy with plaintiff's allegation of discrimination, allegedly telling plaintiff that "I am sorry to see you take that stand. As an engineer you had a good potential at Boeing with your DAS experience and flying time." Under the circumstances, the fact that Meadows had the final say on the hiring decision would not preclude a reasonable jury from finding that age or national origin discrimination was a motivating factor in the decision not to hire plaintiff for one of the January 2002 positions. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (plaintiff must establish that his age "actually played a role in [the employer's deci-

sionmaking] process and had a determinative influence on the outcome.").

The foregoing evidence must also be considered in light of other circumstances. When Art Meadows and Matt Archer wrote the requisition for the January 2002 positions, they tried to make it as complete as possible. The minimum requirements they listed included an FAA ATP or commercial pilot's license with a 707/KC–135 type rating, at least 1500 hours as pilot in command, and an engineering or equivalent degree. The requisition also stated that currency in the KC–135 or other Boeing aircraft was preferred. Plaintiff had far more hours in the KC–135 than Tsuyoshi Tung. Plaintiff also had an engineering degree; Tung did not. Plaintiff had worked as a part-time test pilot for Boeing in prior years and according to Meadows had done a good job. Tung had not worked for Boeing. Boeing now contends that Tung was a more preferable candidate because he had an IP rating, whereas plaintiff did not. There would certainly be nothing wrong with Boeing considering an IP rating in assessing the candidates, and a jury weighing the evidence might find that this was the actual motivation for Boeing's decision. But the critical importance Boeing now apparently places upon this factor seems at odds with it not being listed in the requisition as a required or preferred qualification. Moreover, plaintiff cites evidence that he could have quickly and easily obtained an IP rating if he had known it was going to be a factor—something that would have been known to Meadows and Archer—but that neither of them ever suggested to plaintiff that he get an IP rating or that an IP rating would be an important consideration. Plaintiff also points out that Goodlove, who was selected for the other January 2002 position, had experience with other Boeing aircraft but did not have the PACER CRAG training, was not current in the

KC–135, and was not an IP on the KC–135. Finally, plaintiff points out that Archer, Harley and Meadows ranked him below other applicants on the list who were also not certified IP's on the KC–135. All of the foregoing could be viewed by a jury as inconsistent with Boeing's explanation as to why it did not offer plaintiff a position.

In its motion for summary judgment, Boeing has made several arguments that could ultimately persuade a jury that its failure to hire plaintiff for the January 2002 positions was based on legitimate business considerations. A jury could find from this evidence that Tung's IP rating was in fact the reason he was selected over plaintiff, and that Goodlove's extensive experience was the reason Boeing selected him. But viewed in the light most favorable to plaintiff, the evidence is not so one-sided as to compel such findings. In sum, plaintiff has established a prima facie case of age discrimination and national origin discrimination relating to Boeing's refusal to hire him for one of the January 2002 test pilot positions, and the court concludes he has cited evidence from which a reasonable jury could find that Boeing's explanation is not worthy of credence. Accordingly, there is a genuine issue of fact for trial as to whether Boeing unlawfully discriminated against plaintiff on account of age or national origin in not selecting him for either one of these positions. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination).

2. *Re–Classification of Matt Archer.* Plaintiff argues there is also a question of fact as to whether age or national origin discrimination motivated Art

Meadows' decision to reclassify Matt Archer as a full-time pilot in March of 2001. Plaintiff argues that pretext is shown because Boeing violated its own policy (PRO–700) by reclassifying Archer, in that the reclassification was a promotion and therefore should have been published and opened up for competitive selection. For its part, Boeing maintains that the reclassification was consistent with its policy and that Archer was selected for the position because of his IP rating on the KC–135.

As to this particular position, the court agrees with Boeing that plaintiff has failed to show a genuine issue of pretext. As an initial matter, notwithstanding plaintiff's argument that the reclassification violated Boeing's PRO–700 policy, the evidence shows that a Boeing Human Resources officer reviewed the circumstances and determined that the reclassification was permissible under Boeing policy. *Cf. Randle v. City of Aurora,* 69 F.3d 441, 454–55 (10th Cir.1995) (the defendant offered evidence that it believed that it was following its own internal procedures, and thus, even if the failure to announce this position was a mistake, it was not pretextual). Moreover, Boeing has presented uncontroverted evidence that it decided to fill the job through reclassification because doing so allowed WDMC to unobtrusively acquire a full-time Wichita test pilot without interference from the head of Flight Operations in Seattle, who was opposed to Wichita having its own test pilots. In light of the evidence, no inference of pretext arises from the fact that Boeing filled the position by reclassification rather than by advertising an open position within the company. *Cf. Randle,* supra. Nor has plaintiff cited any evidence of pretext concerning Boeing's selection of Matt Archer over plaintiff for the position. Archer was selected by Art Meadows and Robert Potillo, who was the Engineer for WDMC Tanker programs, and approved by Paul Beckmann, the Chief Engineer for WDMC. Although Archer was younger than plaintiff, he had been the first Wichita pilot used as a part-time test pilot in 1998. He was also certified as an IP on the KC–135. Plaintiff has not cited any evidence to undermine Boeing's explanation that having at least one IP among the Wichita test pilots was critical in allowing Boeing to keep pilots current and to efficiently schedule and conduct flight testing without having to obtain support from McConnell squadrons. As to this position, the court sees no evidence that could reasonably support a finding of pretext. In sum, there is no direct or circumstantial evidence that discrimination played any role in Boeing's failure to allow plaintiff to apply for this position or in its selection of Archer. Accordingly, Boeing's motion for summary judgment will be granted with respect to this employment decision.

### B. USERRA Claims.

Plaintiff next contends Boeing unlawfully discriminated against him on the basis of military service by removing him from the flight roster while he was on active duty, and by considering his military service as a negative factor when it passed him over in favor of Tung and Goodlove for the January 2002 test pilot positions.

Section 4311(a) of Title 38, United States Code, provides in part that any person who is a member of the uniformed services "shall not be denied initial employment, ... promotion, or any benefit of employment by an employer on the basis of that membership or service...." An employer is considered to have engaged in prohibited discrimination under this section if the individual's membership or service in the uniformed services "is a motivating factor in the employer's decision, unless the employer can prove that

the action would have been taken in the absence of such membership [or] service...." § 4311(c)(1). An employee making a USERRA discrimination claim bears the initial burden of showing by a preponderance of the evidence that the employee's military service was "a substantial or motivating factor" in the adverse employment action. If this requirement is met, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason. *Gagnon v. Sprint Corp.*, 284 F.3d 839, 853–54 (8th Cir.2002) (*citing Sheehan v. Dept. of Navy*, 240 F.3d 1009, 1013 (Fed.Cir.2001)). Unlike the *McDonnell Douglas* framework, the framework in § 4311 shifts the burden of persuasion, as well as production, to the employer. "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer's] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." *Id.* (*citing Sheehan*, 240 F.3d at 1014).

■ Plaintiff has cited no evidence from which a jury could reasonably find that plaintiff's military service was a substantial or motivating factor in Boeing's employment decisions. With regard to plaintiff's removal from the flight roster, there is nothing in the record to contradict Boeing's explanation that plaintiff was removed due to objections from Ken Higgins, Boeing's Vice President in charge of Flight Operations. The record is uncontroverted that Art Meadows met with Higgins in July 2001 and that Higgins voiced strong opposition to the practice of using engineers as part-time pilots.[6] Meadows understood that Higgins was giving a mandate to stop using part-time pilots such as plaintiff. Consequently, Meadows informed plaintiff in August 2001 that he was grounded until the problem could be resolved. Despite this, plaintiff's name was not removed from the flight roster until November of 2001, when it came to Meadows' attention that plaintiff's name was still on the list. Meadows testified that he assumed Ed Kisby (who maintained the roster) had previously removed plaintiff's name because Kisby had been present at the meeting with Higgins. Meadows testified that when he discovered plaintiff was still listed, he directed Kisby to remove plaintiff's name. Plaintiff does not challenge the fact that he was notified by Meadows in August of 2001 that he was grounded—which was prior to plaintiff being called up for active duty—but argues an inference of discrimination arises because "Boeing waited until Goico was called up for active duty to remove him from its published roster as an active pilot." The assertion that Meadows purposefully waited until plaintiff was on active duty to remove his name from the list, however, is based on pure speculation. No evidence is cited to reasonably suggest plaintiff was removed from the list for any reason connected to his military service.

Plaintiff also argues that a USERRA claim exists as to Boeing's selection for the two January 2002 test pilot positions based on Mike Fahrney's declaration that he believed plaintiff lacked recency of experience flying the KC–135 because of plaintiff's "rank (Colonel) and his recent assignments in the Reserves." Fahrney's declaration explained that in his experience, senior officers usually have a less

---

6. Whether Higgins in fact opposed this practice due to safety considerations—as he claimed—or whether his opposition was part of a larger "turfbattle" between various Boeing departments is irrelevant insofar as the present motion is concerned.

active flying schedule than more junior officers, and that plaintiff's recent assignments in the Reserves appeared to involve more work on the ground than actual flying. Plaintiff argues that this shows Boeing considered his military service as a negative factor in weighing his qualifications. The court agrees with Boeing that no genuine issue of material fact exists as to this claim. As an initial matter, no evidence is cited that Fahrney's belief on this particular point was conveyed to Meadows or that it played any role in Boeing's failure to offer plaintiff a position. As such, plaintiff has failed make an initial showing that his military status was at a motivating or substantial factor in Boeing's decision. Moreover, as Boeing points out, both of the individuals hired for the January 2002 positions had prior or current military experience, and there is uncontroverted evidence that Boeing considered military service as a plus when hiring pilots. In this regard, the court agrees with Boeing that USERRA does not prohibit an employer from weighing the job-related skills that various applicants may have acquired in military service. The evidence cited simply does not give rise to an inference that Boeing discriminated against plaintiff "on the basis of [his military] membership or service." Accordingly, Boeing is entitled to summary judgment on the USERRA claims.

## C. *Retaliation Claims.*

Plaintiff contends that after he complained of discrimination relating to the hiring process for the two January 2002 test pilot positions, Boeing retaliated against him by not selecting him for one of the open positions. He further argues that Boeing's subsequent failure to select him for numerous other positions, its delays in certifying him as a DAS Coordination Engineer, and its giving him an R–4 retention rating were all additional acts of retaliation.

■ Title VII makes it unlawful for an employer "to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The Age Discrimination in Employment Act (ADEA) contains a similar provision. 29 U.S.C. § 623(d). Where a claim of retaliation is based primarily on circumstantial evidence, as it is here, the court applies the same *McDonnell Douglas* burden-shifting framework previously discussed. In order to make out a prima facie case of retaliation under Title VII or the ADEA, a plaintiff generally must prove (1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action. *See Jeffries v. State of Kansas,* 147 F.3d 1220 (10th Cir.1998).[7]

■ Under the uncontroverted facts, plaintiff has established a prima facie case regarding Boeing's failure to select him for one of the January 2002 pilot positions. Plaintiff complained to Boeing about age

---

7. Plaintiff also claims Boeing retaliated against him for asserting that he was being discriminated against on account of his military status. *See* 38 U.S.C. § 4311(b) (prohibiting retaliation for asserting USERRA rights). Given the absence of any evidence whatsoever that plaintiff's military service or his complaint about discrimination on account of military service was a motivating factor in Boeing's decisions, the court concludes that Boeing is entitled to judgment as a matter of law insofar as plaintiff's retaliation claim is based on USERRA.

and national origin discrimination in January 2002 based on the actions of Matt Archer. Within a matter of weeks thereafter, Archer and Harley ranked plaintiff last out of the seven candidates who were qualified for two pilot positions, and there is some evidence they provided false or questionable information to Art Meadows concerning plaintiff's qualifications. A jury could reasonably infer from the evidence cited by plaintiff that Meadows relied upon that information. Plaintiff has also cited evidence that he had qualifications superior to other candidates who were ranked ahead of him by Archer, Harley and Meadows. There is clear evidence that Archer was aware of plaintiff's discrimination complaints at the time of these assessments. There is evidence of comments or actions by Archer and/or Harley during this period arguably reflecting prejudice against plaintiff on account of his age and national origin. Additionally, Meadows voiced displeasure to plaintiff over the fact that he had lodged a discrimination complaint. Given the circumstances, plaintiff has cited evidence of a causal connection between his discrimination complaint and the failure to hire him for these positions. Moreover, for largely the same reasons previously noted, the court finds there is a genuine issue as to whether Boeing's explanation for its failure to hire plaintiff is credible. Accordingly, Boeing's motion for summary judgment must be denied insofar as plaintiff claims that Boeing unlawfully retaliated by not hiring him for one of the January 2002 pilot positions.

■ Plaintiff's allegations of retaliation relating to other positions at Boeing stand on a different footing. Plaintiff's brief does not specifically address the uncontroverted evidence relating to Boeing's failure to hire him for the following positions: Engineer/Scientist Manager (posted July 2002); Strategy Analyst Specialist Manager (April 2002); Marketing and Sales Representative (August 2002); Marketing and Sales Process Specialist (October 2002); Marketing and Sales Representative Manager (November 2002); Program Management Specialist Position (December 2002); and Test Pilot Position (February 2003). Instead, plaintiff asserts generally that the temporal relationship between his discrimination complaint and his being passed over for the positions is sufficient to establish a prima facie case of retaliation. The court disagrees. As Boeing points out, except for the April 2002 position, these openings occurred between five and twelve months after plaintiff first complained of discrimination. Boeing cites uncontroverted evidence that five of the seven managers responsible for these decisions were not even aware that plaintiff had complained of discrimination. On top of this, plaintiff has failed to cite anything to show that Boeing's explanation for these decisions is a pretext for retaliation. For example, plaintiff's brief fails to address Boeing's uncontroverted evidence that plaintiff was not the most qualified candidate for these particular positions. As such, Boeing is entitled to summary judgment on this portion of the retaliation claim.

■ The court likewise sees no genuine issue of fact for trial on plaintiff's claim that Boeing retaliated by giving him a lower retention rating or by delaying his DAS certification. With regard to the retention rating, plaintiff cites no evidence of a causal connection between the rating (which was determined by a board of managers) and his complaint of discrimination. Plaintiff did not even suffer an actual reduction in his rating in 2003 because the initial R–4 rating he received was adjusted under the CBA to an R–3, the same rating he had received in prior exercises. Nor has plaintiff cited any evidence that Boeing's explanation of why plaintiff received

the rating is a pretext. As for the delay in DAS certification, plaintiff has likewise failed to point to specific facts showing a genuine issue for trial. Plaintiff complains that John Lee repeatedly asked him to submit the paperwork necessary to become certified, but there is no evidence to tie this in any way to plaintiff's discrimination complaint or to show that it was anything other than a bureaucratic snafu. Plaintiff also complains that Boeing acted rapidly to certify Deborah Hoppas, a young engineer, in contrast to the lengthy delay on his request. But there is no evidence that the delay in plaintiff's paperwork was out of the ordinary or that plaintiff was similarly or better qualified than Ms. Hoppas. In fact, it is uncontroverted that in March of 2003 the evaluation panel reviewing plaintiff's application unanimously agreed that plaintiff was not ready for a full position and needed to continue in his capacity as a Candidate to gain more experience. In sum, no evidence has been cited that the delay in plaintiff's DAS certification was an act of retaliation. *Cf. Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220 (10th Cir.2000) (differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext).

Lastly, plaintiff alleged in his complaint that Boeing was liable for other acts of retaliation, including vandalism to plaintiff's automobile and to his residence. Plaintiff's brief does not address Boeing's motion for summary judgment as to these acts, and no evidence is cited that Boeing was responsible for them. Accordingly, Boeing is entitled to summary judgment with respect to these allegations.

### V. Conclusion.

In sum, defendant Boeing's Motion for Summary Judgment (Doc. 70) is GRANT-ED IN PART and DENIED IN PART as follows:

Plaintiff has shown the existence of genuine issues of material fact on his claims that Boeing engaged in unlawful age discrimination, national origin discrimination, and retaliation relating to Boeing's failure to hire plaintiff for the test pilot positions posted in January of 2002. Accordingly, Boeing's Motion for Summary Judgment is denied with respect to these claims.

Boeing's Motion for Summary Judgment is granted with respect to all other claims, including plaintiff's claims under USER-RA, and his claims of age discrimination, national origin discrimination, and retaliation relating to employment decisions other than Boeing's failure to hire plaintiff for the January 2002 test pilot positions.